IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

FILED
IN OPEN COURT

AUG – 6 2026

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 1:26-cr-136 |
| v. | Count 1: Conspiracy to Participate in the Affairs of an Enterprise through a Pattern of Racketeering Activity – RICO Conspiracy (18 U.S.C. § 1962(d)) |
| GERMAN JOSETH TORRES LIZAMA, a/k/a "Tavares Duende," a/k/a "Terrorista," | Counts 2 and 3: Murder in Aid of Racketeering Activity (18 U.S.C. §§ 1959(a)(1) and 2) |
| *Defendant.* | Forfeiture Notice |

**INDICTMENT**

August 2026 Term – Alexandria, Virginia

THE GRAND JURY CHARGES THAT:

**COUNT ONE**

*(Conspiracy to Participate in the Affairs of an Enterprise Through a Pattern of Racketeering Activity – RICO Conspiracy)*

General Allegations

At all times relevant to this Indictment:

1.     *La Mara Salvatrucha*, also known as MS-13, was a gang composed primarily of immigrants or descendants of immigrants from Central America, with members operating in Virginia, including in Fairfax County, Prince William County, and Alexandria, and throughout the United States, including in Maryland, Massachusetts, and North Carolina.

2.      In the United States, MS-13 has been functioning since at least the 1980s. MS-13 originated in Los Angeles, California, where MS-13 members banded together for protection against more established gangs in the area. MS-13 quickly spread to states across the country, including Virginia.

3.      MS-13 was a transnational criminal organization and was one of the largest street gangs in the United States. Gang members actively recruited members, including juveniles, from communities with a large number of Central American immigrants.

4.      Members of MS-13 from time to time signified their membership by wearing tattoos reading "*MARA SALVATRUCHA*," "MS," "MS-13," or similar tattoos, often written in gothic lettering. Members also signified their membership through tattoos of devil horns in various places on their bodies. Members sometimes avoided conspicuous MS-13 tattoos, instead wearing discreet ones such as three dots in a triangle formation signifying "*mi vida loca*" or clown faces with phrases such as "laugh now, cry later." Some MS-13 members chose not to have tattoos at all or placed them on areas such as the hairline where they could be easily covered, in order to conceal their gang affiliation from law enforcement.

5.      MS-13 members referred to one another by their gang monikers, or "*tacas*," and often did not know fellow gang members except by their gang names.

6.      Members of MS-13 were expected to protect the name, reputation, and status of the gang from rival gang members and other persons. MS-13 members required that all individuals show respect and deference to the gang and its membership. To protect the gang and to enhance its reputation, MS-13 members were expected to use any means necessary to force respect from those who showed disrespect, including acts of intimidation and violence.

2

7.      Members and associates of MS-13 frequently engaged in criminal activity, including, but not limited to, murder, assault, and drug trafficking, as well as attempts and conspiracies to commit such offenses. MS-13 members and associates were required to commit acts of violence to maintain membership and discipline within the gang. Participation in criminal activity by a member, particularly in violent acts directed at rival gangs or as directed by gang leadership, increased the respect accorded to that member, resulted in that member maintaining or increasing position in the gang, and opened the door to a promotion to a leadership position. One of the principal rules of MS-13 was that its members must attack and kill rivals whenever possible. Rivals were often referred to as "*chavalas*." MS-13, in Virginia and elsewhere, maintained rivalries with, among others, the 18th Street gang.

8.      Prospective members who sought to join MS-13 were required to complete an initiation process. Individuals who associated and committed crimes with the gang were historically called "*esquinas*," "*paros*," or "*observaciones*"; however, more recently, have been referred to as "*ayudantes*." Individuals who were attempting to join the gang were historically called "*chequeos*," or "cheqs," but more recently referred to as "*futuros*." *Chequeos* or *futuros* underwent a probationary period during which they were required to commit crimes on behalf of MS-13 to achieve trust and prove their loyalty to the gang. To join MS-13 and become full members or "homeboys," prospective members were required to complete an initiation process, often referred to as being "jumped in" or "beat in" to the gang. During that initiation, other members of MS-13 would beat the new member, usually until a gang member finished counting aloud to the number 13.

9.      Within MS-13, the primary unit of organization was known as a "clique," that is, smaller groups operating in a specific city or region. Cliques operated under the umbrella rules of

3

MS-13. MS-13 cliques often worked together cooperatively to engage in criminal activity and to assist one another in avoiding detection by law enforcement. In and around Virginia, these cliques included, among others, the *Vegas Locos Salvatrucha* ("VLS"), *Palmas Locos Salvatrucha, Pinos Locos Salvatrucha*, Fulton *Locos Salvatrucha*, and others.

10.    Each clique was presided over by the "First Word," the leader or president of the clique. The leader was also sometimes referred to as the *"Primera Palabra"* or *"Corredor."* Depending on the clique, the "Second Word," or *"Segunda Palabra,"* was the second-in-command of the clique. General members were required to take orders from at least the First Word.

11.    MS-13 cliques kept in contact and reported to the leaders for their respective cliques, who were oftentimes based in various states or in El Salvador. Cliques contacted their leaders based in other states, or El Salvador or other countries, using cellular telephones during clique meetings to keep them updated on gang business, for advice, and to resolve disagreements regarding operations among local cliques.

12.    MS-13 members met on a regular basis to, among other things, discuss gang affairs and report on acts of violence committed by their members with the goal of inciting and encouraging further violence. Each clique held clique meetings where business specific to that clique was discussed. Any perceived indiscretions by members or violations of MS-13 rules were talked about at clique meetings and punishments, also known as *"calentones," "correctivos,"* "corrections," "courts," or "violations," were issued. Violations often took the form of beatings by fellow MS-13 members. More serious violations resulted in the issuance of a "greenlight." A greenlight was an order and/or approval to kill the supposed violator.

13.    MS-13 received money and income from sources including member dues and drug trafficking. Such funds were used for gang purposes, including obtaining weapons and drugs and

4

providing support for MS-13 gang members who were imprisoned in the United States, both inside and outside of Virginia, and in El Salvador.

14.    MS-13 members communicated about gang activities with other MS-13 members in Virginia and elsewhere using cellphones, text messaging, social media applications such as Facebook, Instagram, and WhatsApp, email, and other modes of communication.

### The Racketeering Enterprise

15.    At all times relevant to this Indictment, MS-13, including its leaders, members, and associates, constituted an enterprise as defined in 18 U.S.C. § 1961(4), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce (the "MS-13 Enterprise" or the "Enterprise"). The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise. At all times relevant to this Indictment, the Enterprise operated in the Eastern District of Virginia and elsewhere.

16.    The defendant, **GERMAN JOSETH TORRES LIZAMA, a/k/a "Tavares Duende," a/k/a "Terrorista," ("TORRES LIZAMA")**, and others, both known and unknown to the Grand Jury, were members and associates of the VLS clique of MS-13.

### Purposes of the Enterprise

17.    The purposes of the MS-13 Enterprise included, but were not limited to:

      a.    Preserving and protecting the power, territory, reputation, and profits of the Enterprise through the use of intimidation, threats of violence, and violence, including assaults and murder;

5

b.   Promoting and enhancing the Enterprise and its leaders', members', and associates' activities, including, but not limited to, murder, extortion, drug trafficking, robbery, and other criminal activities;

c.   Keeping victims, potential victims, and community members in fear of the Enterprise through violence and threats of violence;

d.   Providing financial support and information to gang leaders, members, and associates, including individuals incarcerated in the United States and in El Salvador;

e.   Providing assistance to gang leaders, members, and associates who committed crimes on behalf of the Enterprise; and

f.   Hindering, obstructing, and preventing law enforcement officers from identifying participants in the Enterprise's criminal activity, from apprehending the perpetrators of those crimes, and from successfully prosecuting and punishing the offenders.

Means and Methods of the Enterprise

18.   Among the means and methods by which members and associates of the MS-13 Enterprise conducted and participated in the conduct of the affairs of the Enterprise were the following:

a.   The members and associates of MS-13 used intimidation, threats of violence, and violence, including assaults and murder, to preserve, expand, and protect MS-13's territory and activities, to promote and enhance its prestige, reputation, and position in the community, and to discipline gang members who had been disloyal or had violated gang rules;

6

b.   The members and associates of MS-13 acquired, possessed, shared, carried, and used deadly weapons, including firearms, to harm and kill rivals and in furtherance of their drug trafficking activities;

c.   The members and associates of MS-13 attended regular gang meetings and communicated with other MS-13 members to discuss, among other things: the structure and organization of the gang; past criminal acts committed against rival gang members and others; MS-13 leaders, members, and associates who had been arrested or incarcerated; the discipline of MS-13 leaders, members, and associates who had violated gang rules; and plans and agreements regarding the commission of future crimes, as well as ways to conceal these crimes;

d.   The members and associates of MS-13 also communicated with other MS-13 members in Virginia and elsewhere, and represented their gang allegiance through social media applications such as Facebook, including by posting photographs of themselves with other gang members, showing gang hand signs, posing with weapons or gang-related graffiti, and by sending and/or posting messages referencing their affiliation with MS-13;

e.   The members and associates of MS-13 distributed and agreed to distribute or assist the distribution of controlled substances, including fentanyl, on behalf of the gang;

f.   The funds raised by the gang were used for gang purposes, including obtaining weapons and drugs and providing support for MS-13 gang

members, including those imprisoned in the United States, inside and outside of Virginia, and in El Salvador;

g.  The members and associates of MS-13 hindered and obstructed the efforts of law enforcement to identify, apprehend, and successfully prosecute and punish gang members;

h.  The members and associates of MS-13 investigated rival gang members or other persons targeted for violence; obtained information about such targets, including locations frequented by them; and used such information in their plans to attack such targets; and

i.  The members and associates of MS-13 agreed that acts involving murder, including conspiracy and attempts to commit murder, and other acts of violence would be committed by members and associates of MS-13 against rival gang members and persons deemed as threats to MS-13 and for the purpose of imposing discipline within the gang, and on other occasions as deemed necessary.

The Racketeering Conspiracy

19.  Beginning on a date unknown, but at least in and around 2021, and continuing through the date of this Indictment, in the Eastern District of Virginia, and elsewhere, **TORRES LIZAMA** and others, both known and unknown to the Grand Jury, being persons employed by and associated with MS-13, an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly and intentionally conspire and agree with each other, to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the

8

conduct of the affairs of the MS-13 Enterprise through a pattern of racketeering activity, as defined in 18 U.S.C. §§ 1961(1) and (5), which pattern of racketeering activity consisted of:

    a.    multiple acts involving murder, chargeable under Virginia Code §§ 18.2-32, 18.2-26, 18.2-22, and 18.2-18; chargeable under North Carolina General Statutes §§ 14-17, 14-5.2, 14-2.4, and 14-2.5; and chargeable under Massachusetts General Laws, Chapter 265 § 1 and Chapter 274 §§ 2, 6 and 7;

    b.    acts indictable under Title 18, United States Code, § 1952 (relating to racketeering) ; and

    c.    multiple offenses involving narcotics trafficking, in violation of 21 U.S.C. §§ 841 and 846.

20.    It was further part of the conspiracy that the defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise.

Overt Acts

21.    In furtherance of the conspiracy, and to affect the object thereof, **TORRES LIZAMA** and others, both known and unknown to the Grand Jury, committed and caused to be committed the following acts, among others, in the Eastern District of Virginia and elsewhere:

**Narcotics Trafficking Activities**

    a.    Beginning on a date unknown, but at least in and around 2021, and continuing through the present, **TORRES LIZAMA** entered and remained in the United States with the purpose, in part, to further the goals of MS-13 in the United States.

    b.    Beginning on a date unknown, but at least in and around 2022, and

9

continuing through the present, **TORRES LIZAMA** conspired with others, both known and unknown to the Grand Jury, to distribute fentanyl in the Eastern District of Virginia and elsewhere.

c.      Beginning on a date unknown, but at least in and around 2022, and continuing through the present, MS-13 members and associates regularly obtained fentanyl from suppliers outside of the Washington, D.C., metropolitan area for retail sale and distribution within the Washington, D.C., metropolitan area. The MS-13 members and associates had the fentanyl pills shipped into the Eastern District of Virginia by use of the mail. **TORRES LIZAMA** used his residence to receive the fentanyl pills, after which MS-13 members and associates picked up the pills for further distribution in the Washington, D.C., metropolitan area.

### July 2024 Murder of A.P.

d.      Beginning in or about May 2024 and continuing to on or about July 18, 2024, in Prince William County, Virginia, within the Eastern District of Virginia, and elsewhere, **TORRES LIZAMA** and other members and associates of MS-13, both known and unknown to the Grand Jury, conspired to murder an individual, identified for the purposes of this Indictment as A.P., because A.P. had outstanding drug debts to MS-13 members and associates in the Northern Virginia area.

e.      On or about May 7, 2024, an MS-13 member and associate threatened to kill A.P. through social media.

f.      In or around July 2024, an MS-13 member and associate issued a greenlight on A.P.

g.      On or about July 18, 2024, an MS-13 member and associate told **TORRES LIZAMA** to kill A.P.

h.      On or about July 18, 2024, **TORRES LIZAMA** murdered A.P by shooting

A.P. multiple times.

i.      On or about July 18, 2024, after **TORRES LIZAMA** murdered A.P., **TORRES LIZAMA** drove A.P.'s vehicle to Centreville, Virginia, where **TORRES LIZAMA** left the vehicle.

**August 2024 Murder of C.R.**

j.      Beginning on a date unknown, but from at least in or around July 2024, and continuing to in and around August 2024, **TORRES LIZAMA** and other members and associates of MS-13, both known and unknown to the Grand Jury, conspired to murder an individual, identified for purposes of this Indictment as C.R., because C.R. was a rival narcotics dealer to MS-13 members and associates in the Charlotte-Mecklenburg, North Carolina, metro area.

k.      In and around July 2024, in Maryland, **TORRES LIZAMA** and other MS-13 members and associates attended a meeting where another MS-13 member and associate issued a greenlight on C.R. During the meeting, an MS-13 member and associate volunteered to murder C.R. to gain membership into MS-13. Also during the meeting, **TORRES LIZAMA** was instructed to travel to North Carolina to assist the MS-13 member in murdering C.R.

l.      In and around July 2024, **TORRES LIZAMA** and an MS-13 member and associate traveled to the Charlotte-Mecklenberg County, North Carolina, metropolitan area, through the Eastern District of Virginia, for the purpose of murdering C.R.

m.      In and around August 2024, in and around the Charlotte-Mecklenburg, North Carolina, metropolitan area, an MS-13 member and associate murdered C.R. by shooting C.R. with a firearm. **TORRES LIZAMA** waited nearby to assist in the murder if needed and to confirm that the MS-13 member and associate carried out the murder. **TORRES LIZAMA** and the other MS-13 member and associate took C.R.'s vehicle, narcotics, and firearm after C.R. was

11

murdered.

n.    In and around August 2024, in and around the Charlotte-Mecklenburg, North Carolina, metropolitan area, **TORRES LIZAMA** and an MS-13 member and associate attempted to hide C.R.'s body in a wooded area.

o.    In and around August 2024, in and around the Charlotte-Mecklenburg, North Carolina, metropolitan area, **TORRES LIZAMA** and an MS-13 member and associate destroyed two cellphones belonging to C.R. in an attempt to evade law enforcement detection for the murder of C.R.

p.    On or about August 4, 2024, **TORRES LIZAMA** and the other MS-13 member and associate drove C.R.'s vehicle into the Eastern District of Virginia and abandoned the vehicle there.

### August 2024–September 2024 Conspiracy to Murder 18th Street Gang Members

q.    From in and around August 2024 through in and around September 2024, in the District of Massachusetts, at the direction of MS-13 leaders, **TORRES LIZAMA** and other MS-13 members and associates, both known and unknown to the Grand Jury, conspired to kidnap and murder members of the 18th Street gang.  The purpose of the conspiracy was to enhance the power and territory of various MS-13 cliques located in the Commonwealth of Massachusetts and to establish the VLS clique in the area.

r.    From in and around August 2024 through in and around September 2024, in the District of Massachusetts, **TORRES LIZAMA** and other MS-13 members and associates searched areas in Massachusetts by vehicle to kidnap and murder members of the 18th Street gang.

### Special Sentencing Factors as to Count One

22.     As part of his agreement to conduct and participate in the conduct of the affairs of MS-13 through a pattern of racketeering activity, the defendant committed the following acts:

a.     On or about July 18, 2024, in the Eastern District of Virginia, the defendant, **GERMAN JOSETH TORRES LIZAMA, a/k/a "Tavares Duende," a/k/a "Terrorista,"** and others, both known and unknown to the Grand Jury, while aiding and abetting each other, did willfully, deliberately, and with premeditation kill A.P., in violation of Virginia Code §§ 18.2-32 and 18.2-18.

b.     In and around August 2024, in the Western District of North Carolina, the defendant, **GERMAN JOSETH TORRES LIZAMA, a/k/a "Tavares Duende," a/k/a "Terrorista,"** and others known and unknown, while aiding and abetting each other, did willfully, deliberately and with premeditation kill C.R., in violation of North Carolina General Statutes §§ 14-17 and 14-5.2.

(In violation of Title 18, United States Code, Section 1962(d).)

## COUNT TWO

### *(Murder in Aid of Racketeering Activity)*

23.    At all times relevant to this Indictment, MS-13, as more fully described in Paragraphs One through Eighteen of Count One of this Indictment, which are re-alleged and incorporated by reference as though set forth fully herein, including its leaders, members, and associates, constituted an enterprise as defined in 18 U.S.C. § 1959(b)(2), namely, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce.    The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

24.    At all times relevant to this Indictment, the above-described MS-13 Enterprise, through its leaders, members, and associates, engaged in racketeering activity, as defined in 18 U.S.C. §§ 1959(b)(1) and 1961(1), namely, (1) multiple acts involving racketeering, indictable under 18 U.S.C. § 1952 and (2) multiple acts involving narcotics trafficking, in violation of 21 U.S.C. §§ 841 and 846.

25.    On or about July 18, 2024, in Prince William County, Virginia, within the Eastern District of Virginia, the defendant, **GERMAN JOSETH TORRES LIZAMA, a/k/a "Tavares Duende," a/k/a "Terrorista,"** together with others, both known and unknown to the Grand Jury, for the purpose of gaining entrance to and maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, each aiding and abetting each other, did murder A.P., in violation of the laws of the Commonwealth of Virginia, specifically, Code of Virginia §§ 18.2-32 and 18.2-18.

(In violation of Title 18, United States Code, Sections 1959(a)(1) and 2.)

14

## COUNT THREE

### *(Murder in Aid of Racketeering Activity)*

26.   At all times relevant to this Indictment, MS-13, as more fully described in Paragraphs One through Eighteen of Count One of this Indictment, which are re-alleged and incorporated by reference as though set forth fully herein, including its leaders, members, and associates, constituted an enterprise as defined in 18 U.S.C. § 1959(b)(2), namely, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce.   The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

27.   At all times relevant to this Indictment, the above-described MS-13 Enterprise, through its leaders, members, and associates, engaged in racketeering activity, as defined in 18 U.S.C. §§ 1959(b)(1) and 1961(1), namely, (1) multiple acts involving murder, chargeable under Virginia Code §§ 18.2-32, 18.2-26, 18.2-22, and 18.2-18; (2) multiple acts involving racketeering indictable under 18 U.S.C. § 1952; and (3) multiple acts involving narcotics trafficking, in violation of 21 U.S.C. §§ 841 and 846.

28.   In or about August 2024, in the Eastern District of Virginia, in the Western District of North Carolina, and elsewhere, the defendant, **GERMAN JOSETH TORRES LIZAMA, a/k/a "Tavares Duende," a/k/a "Terrorista,"** together with others, both known and unknown to the Grand Jury, for the purpose of gaining entrance to and maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, each aiding and abetting each other, did murder C.R., in violation of the laws of the State of North Carolina, specifically, North Carolina General Statutes §§ 14-17 and 14-5.2.

(In violation of Title 18, United States Code, Sections 1959(a)(1) and 2.)

15

## NOTICE OF SPECIAL FINDINGS

The allegations of Counts Two and Three of this Indictment are hereby realleged and incorporated by reference as if fully set forth herein.

### Count Two

As to Count Two, the defendant

### GERMAN JOSETH TORRES LIZAMA
### a/k/a "Tavares Duende,"
### a/k/a "Terrorista,"

1.    Was more than 18 years of age at the time of the offense (18 U.S.C. § 3591(a));

2.    Intentionally killed the victim (18 U.S.C. § 3591(a)(2)(A));

3.    Intentionally inflicted serious bodily injury that resulted in the death of the victim (18 U.S.C. § 3591(a)(2)(B));

4.    Intentionally participated in acts, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offenses, and the victim died as a result of the acts (18 U.S.C. § 3591(a)(2)(C));

5.    Intentionally and specifically engaged in acts of violence knowing that the acts created a grave risk of death to a person, other than one of the participants to the offenses, such that participation in the acts constituted a reckless disregard for human life and the victim died as a result of the acts (18 U.S.C. § 3591(a)(2)(D)); and

6.    Committed the offense after substantial planning and premeditation to cause the death of a person (18 U.S.C. § 3592(c)(9)).

(All pursuant to Title 18, United States Code, Sections 3591 and 3592).

### Count Three

As to Count Three, the defendant

### GERMAN JOSETH TORRES LIZAMA
### a/k/a "Tavares Duende,"
### a/k/a "Terrorista,"

1.    Was more than 18 years of age at the time of the offense (18 U.S.C. § 3591(a));

2.    Intentionally killed the victim (18 U.S.C. § 3591 (a)(2)(A));

16

3.    Intentionally inflicted serious bodily injury that resulted in the death of the victim (18 U.S.C. § 3591(a)(2)(B));

4.    Intentionally participated in acts, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offenses, and the victim died as a result of the acts (18 U.S.C. § 3591 (a)(2)(C));

5.    Intentionally and specifically engaged in acts of violence knowing that the acts created a grave risk of death to a person, other than one of the participants to the offenses, such that participation in the acts constituted a reckless disregard for human life and the victim died as a result of the acts (18 U.S.C. § 3591 (a)(2)(0)); and

6.    Committed the offense after substantial planning and premeditation to cause the death of a person (18 U.S.C. § 3592(c)(9)).

(All pursuant to Title 18, United States Code, Sections 3591 and 3592).

17

## FORFEITURE NOTICE

THE GRAND JURY FURTHER FINDS that there is probable cause that the property described below is subject to forfeiture.

Pursuant to Fed. R. Crim. P. 32.2(a), the defendant is hereby notified that, upon conviction of the offense set forth in Count One of this Indictment, he shall forfeit to the United States, pursuant to 18 U.S.C. § 1963, the following: (1) any interest acquired or maintained in violation of 18 U.S.C. § 1962; (2) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over any enterprise which they have established, operated, controlled, conducted, or participated in the conduct of, in violation of 18 U.S.C. § 1962; and (3) any property constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity in violation of 18 U.S.C. § 1962.

Pursuant to Fed. R. Crim. P. 32.2(a), the defendant is hereby notified that, if convicted of any violation set forth in this Indictment, he shall forfeit to the United States, pursuant to Title 18, United States Code, Section 924(d)(1), and Title 28, United States Code, Section 2461(c), all firearms and ammunition involved in or used in the commission of the offense.

*(Continued on next page.)*

As to Count One of this Indictment, pursuant to 18 U.S.C. § 1963(m), the defendant shall forfeit substitute property, if, by any act or omission of the defendant, the property referenced above cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

(In accordance with 18 U.S.C. §§ 924(d)(1) and 1963; 21 U.S.C. § 853; 28 U.S.C. § 2461(c); and Fed. R. Crim. P. 32.2(a))

A TRUE BILL

Pursuant to the E-Government Act,, The original of this page has been filed under seal in the Clerk's Office

_____
FOREPERSON

Todd W. Blanche
Acting Attorney General

David L. Jaffe, Chief
Violent Crime and Racketeering Section
U.S. Department of Justice

Theophani K. Stamos
First Assistant United States Attorney

By: _____
Christopher M. Carter
Assistant United States Attorney
Eastern District of Virginia

_____
Christopher Matthews
Trial Attorney